**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| MICHIANA DAIRY PROCESSORS, LLC, | ) | |
|        Plaintiff, | ) | |
|        v. | ) | CAUSE NO.: 2:09-CV-39-PRC |
| | ) | |
| ALL STAR BEVERAGE, INC., ROGER | ) | |
| MOHLMAN, PRIME STAR GROUP, INC. f/k/a | ) | |
| AMERICAN WATER STAR, INC., ALL STAR | ) | |
| BEVERAGE OF ARIZONA, INC., GEYSER | ) | |
| BEVERAGES, INC., HAWAIIAN TROPICALS, | ) | |
| INC., and DONNA MOHLMAN, | ) | |
|        Defendants. | ) | |
| _____ | ) | |
| | ) | |
| ALL STAR BEVERAGE, INC., | ) | |
|        Counter-Claimant, | ) | |
|        v. | ) | |
| | ) | |
| MICHIANA DAIRY PROCESSORS, LLC, | ) | |
|        Counter-Defendant. | ) | |
| _____ | ) | |
| | ) | |
| AMERICAN WATER STAR, INC., ALL STAR | ) | |
| BEVERAGE OF ARIZONA, INC., GEYSER | ) | |
| BEVERAGES, INC., and HAWAIIAN | ) | |
| TROPICALS, INC., | ) | |
|        Counter-Claimants, | ) | |
|        v. | ) | |
| | ) | |
| MICHIANA DAIRY PROCESSORS, LLC, | ) | |
|        Counter-Defendant. | ) | |
| _____ | ) | |
| | ) | |
| DONNA MOHLMAN, | ) | |
|        Counter-Claimant, | ) | |
|        v. | ) | |
| | ) | |
| MICHIANA DAIRY PROCESSORS, LLC, | ) | |
|        Counter-Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on (1) a Motion for Summary Judgment [DE 171], filed by Defendants All Star Beverage, Inc., Prime Star Group, Inc. f/k/a American Water Star, Inc., All Star Beverage of Arizona, Inc., Geyser Beverage, Inc., Hawaiian Tropicals, Inc., Roger Mohlman, and Donna Mohlman (collectively "Defendants") on July 15, 2010; and (2) an Objection to and Motion to Strike Certain Designated Evidence [DE 184], filed by Plaintiff Michiana Dairy Processors, LLC ("Michiana"). For the reasons set forth in this order, the Court grants in part and denies in part the Motion to Strike and grants the Motion for Summary Judgment.

**PROCEDURAL BACKGROUND**

In the Lake Circuit Court, Michiana filed a Complaint against Star Beverage, Inc. and Roger Mohlman on April 14, 2004, a First Amended Complaint against All Star Beverage, Inc., American Water Star, Inc., All Star Beverage of Arizona, Inc., Geyser Beverages, Inc., Hawaiian Tropicals, Inc., John Doe, Jane Doe, and Roger Mohlman on March 17, 2008, and a Second Amended Complaint, adding Donna Mohlman as a defendant, on February 2, 2009.

Count I of the Second Amended Complaint for "Individual Liability" alleges the individual liability of Roger Mohlman. Count II for "Illegal Transfer of Assets" alleges that the corporate Defendants and Roger Mohlman violated Indiana and federal law, including the Indiana Fraudulent Transfer Act, by concealing, hiding, and secreting corporate assets and removing the assets in order to delay and/or prevent the attachment thereof by creditors and claimants. Count III for "Breach of Contract" alleges that the corporate Defendants' conduct constitutes breach of contract and that as a direct and proximate result thereof, Michiana suffered damages. Count IV is for "Intentional Breach of Contract." Count V for "Fradulent[sic] Inducement," despite its subtitle, makes the same

claims as Count IV for Intentional Breach of Contract. Against Donna Mohlman, in a section entitled "Third Party Claims Against Donna Mohlman," Michiana alleges "Constructive Fraud," a "Claim for Money Had and Received," and "Fraudulent Concealment."

On March 2, 2009, Donna Mohlman filed a Notice of Removal and an Answer and Counterclaim, alleging defamation. On April 1, 2009, Michiana filed a waiver of possible defects in the notice of removal.

On May 8, 2009, Defendants American Water Star, Inc., All Star Beverage of Arizona, Inc., Geyser Beverages, Inc., and Hawaiian Tropicals, Inc. ("American Water Star Defendants") filed an Answer and a Counterclaim for abuse of process.

The same date, Defendant All Star Beverage, Inc. filed an Answer and a Counterclaim for breach of warranty of merchantability and fitness for a particular purpose.

On May 18, 2009, Michiana filed a Rule 12(f) Motion to Strike the Answer and Counterclaim of the American Water Star Defendants, which the Court denied on September 16, 2009. Michiana has not filed an Answer to the Counterclaim brought by the American Water Star Defendants.

On May 20, 2009, Michiana filed an Answer and Affirmative Defenses to Donna Mohlman's Counterclaim.

On May 27, 2009, Michiana filed an Answer to the Counterclaim brought by All Star Beverage.

On December 4, 2009, Defendant All Star Beverage filed a Motion to Dismiss Pursuant to Rule 41(b), which the Court denied on February 11, 2010.

On July 15, 2010, Defendants filed the instant Motion for Summary Judgment and a memorandum in support. Having been granted an extension of time, Michiana filed a response in opposition to summary judgment on September 10, 2010, as well as the instant Motion to Strike. Defendants filed a reply in support of summary judgment on September 23, 2010, and a response in opposition to the Motion to Strike on September 28, 2010. Michiana did not file a reply in support of the Motion to Strike, and the time to do so has passed.

The parties orally agreed on the record to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## MOTION TO STRIKE

In the motion, Michiana objects to and asks the Court to strike numerous exhibits submitted by Defendants in support of the Motion for Summary Judgment, citing generally and without argument Federal Rules of Evidence 104(a), 802, and 901.

*1. Exhibit 2*

Michiana argues that the letter that purports to be from the Indiana State Department of Health to Donna Mohlman, dated June 1, 2009, is hearsay and is not properly authenticated. This document is authenticated pursuant to Federal Rule of Evidence 901(b)(7), which provides for authentication based on evidence that a "purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept." Fed. R. Ev. 901(b)(7). However, the contents of the letter are hearsay, as the contents are being offered to prove the truth of the matter asserted, namely that the author was unable to locate any records of registration by Michiana Dairy Processors, LLC with the Food Protection Program. Although the

contents of the letter being offered to show the absence of a public record qualifies as an exception to the hearsay rule under Rule 803(10), that rule in turn requires self-authentication under Federal Rule of Evidence 902, which is not met. *See* Fed. R. Ev. 803(10), 902(2). Accordingly, the hearsay objection is sustained, and the Court strikes Exhibit 2.

## 2. *Exhibits 3, 4, and 5*

Michiana argues, without discussion, that the Heartland bankruptcy documents are irrelevant. Federal Rule of Evidence 401 provides that, in order to be admissible, evidence must be relevant, meaning that it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Ev. 401. Defendants offer these documents in support of background information concerning Dixie Dairy and Michiana Dairy; accordingly, the Court finds they are relevant.

Michiana also argues that the documents are not properly authenticated because they are not certified copies as required by Rule 902. Federal Rule of Civil Procedure 902 provides that "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required" for certified copies of public records. Fed. R. Ev. 902(4). However, Rule 901(b)(7) provides that evidence can be authenticated by showing that the document is "authorized by law to be recorded or filed and in fact was recorded or filed in a public office, or a purported public record, report, statement, or data compilation in any form is from the public office where items of this nature are kept." Fed. R. Ev. 901(b)(7). These documents were filed in a United States Bankruptcy Court proceeding, as confirmed by the file stamp that is printed across the top of the documents. Thus, the Court finds that they are properly authenticated.

*3. Exhibit 12*

Michiana argues that the email which purports to be from a person designated as Harford is hearsay and is not properly authenticated. Because the Court does not rely on this email in its analysis, the motion is denied as moot.

*4. Exhibit 16*

Michiana contends that the NIPSCO bills and unsigned agreement submitted together are hearsay, are not properly authenticated, and do not have a proper foundation. These documents were produced by Michiana in response to discovery requests. Therefore, the objection as to authentication is overruled. *See Vulcan Golf,* 2010 WL 2363620, at *2. As to the hearsay objection, the NIPSCO bills are being offered to show Michiana's usage history in the months before and after the execution of the Packaging Agreement. The NIPSCO bills fall within the business records exception of Federal Rule of Evidence 803(6). Although Defendants have not offered any accompanying testimony or certification under Rule 803(6), the Court finds that the NIPSCO bills are inherently trustworthy as the documents are the printed bills as would be produced from NIPSCO, Michiana produced the document in the course of discovery, the bills were used during the deposition of Neil Fribley without objection, and Michiana has not offered any argument, either in support of the Motion to Strike or in opposition to the Motion for Summary Judgment, that the NIPSCO bills offered by Defendants are not the same bills Michiana produced in discovery or that the bills have been modified or tampered with. The objection is overruled.

*5. Exhibit 17*

Michiana argues that what appears to be pages from a July 15, 2010 fax contains only pages 13, 16, 17, 19, 20, and 21 and that the documents are hearsay, are not properly authenticated, and

do not have a proper foundation. Pages 13, 16, and 17 were produced by Michiana in response to discovery requests; therefore, the objection as to authentication is overruled. *See Vulcan Golf,* 2010 WL 2363620, at * 2. As to the hearsay objection, all three documents fall within the business records exception of Federal Rule of Evidence 803(6), but are not accompanied by the requisite testimony or certification required by Rule 803(6) (setting forth that records of regularly conducted activity is an exception to the hearsay rule under certain circumstances "as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification") Accordingly, the objection as to hearsay is sustained.

As for pages 19-21, Defendants argue that they were produced by *Defendants* during Plaintiff's inspection of company records in Las Vegas, NV. The production by Defendants in discovery of documents sought to be used by Defendants on summary judgment does not meet the conditions for authenticity set out in *Vulcan Golf.* Therefore, the objection is sustained. The Court strikes Exhibit 17.

*6. Exhibit 24*

Michiana argues that the STL Analytical Report is hearsay, is not properly authenticated, and does not have a proper foundation. Defendants respond that this report was produced by Michiana in response to discovery requests. Thus, the objection as to authentication is overruled. *See Vulcan Golf,* 2010 WL 2363620, at *2. As to the hearsay objection, the Court finds that the test results are not offered for the truth of the matter asserted, namely the results of the tests, but rather to show that testing was done. The objection as to hearsay is overruled.

*7.  Exhibit 27*

Michiana contends that these photos are purported to be taken some time after August 2003, but there is no foundation for these photos as they may have been taken years later.  During the course of discovery, Defendants served a Request to Admit on Plaintiff that provided: "Admit that the 90 pictorial representations attached and incorporated as Exhibit A are a true and accurate representation of the Dixie Dairy/Michiana Dairy Processing Plant, subsequent to August 30, 2003, where Plaintiff alleges it would have packaged the water product known as H20."  Because Michiana failed to respond to the Request to Admit, the requests are deemed admitted pursuant to Federal Rule of Civil Procedure 36, and, thus, Michiana has admitted that the pictures accurately represent what the plant looked like after August 30, 2003.  Michiana's objection is overruled.

*8.  Insurance documents*

Michiana argues that the insurance documents, including the unsigned document, are hearsay, are not properly authenticated, and do not have a proper foundation.  However, Defendants respond that these insurance documents were produced by Michiana in response to discovery requests.  Thus, the objection as to authentication is overruled.  *See Vulcan Golf,* 2010 WL 2363620, at * 2.  As to the hearsay objection, the insurance policy is being offered to show that Michiana obtained insurance with an occurrence limit of $1,000,000.00, which is printed on the insurance policy submitted into evidence by Defendants and which was produced by Michiana in the course of discovery. The insurance policy falls within the business records exception of Federal Rule of Evidence 803(6).  Although Defendants have not offered any accompanying testimony or certification under Rule 803(6), the Court finds that the insurance document is inherently trustworthy as the document is the printed insurance policy as would be produced from an insurance

company, Michiana produced the document in the course of discovery as the insurance policy it obtained under the Packaging Agreement, and Michiana has not offered any argument, either in support of the Motion to Strike or in opposition to the Motion for Summary Judgment, that the insurance policy offered by Defendants is not the same policy Michiana produced in discovery, that the insurance policy has been modified or tampered with, or that Michiana did in fact have a policy with a per occurrence limit of anything other than $1,000,000.00. The objection is overruled.

*9. Exhibit 37*

Michiana objects to Roger Mohlman's affidavit because it does not contain the affirmation required by 28 U.S.C. § 1746. Because Roger Mohlman's affidavit was sworn to in front of a notary public, the language of § 1746 for *unsworn* affidavits is not required. *See Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). This objection is overruled. Because the Court did not rely on the specific objected-to statements, the remainder of the motion as to Exhibit 37 is denied as moot.

*10. Exhibit 38*

Michiana argues that the affidavit of Gary Chernay is deficient because it does not set a foundation with either facts or his qualifications that would provide a basis that he is qualified or has knowledge of facts that support all the opinions he provides other than to say he is a resident of Las Vegas and holds the positions of Head of the Audit Committee and In House Counsel for Prime Star Group, Inc. Because the Court does not rely on any of the statements in Cherney's affidavit, the motion as to Exhibit 38 is denied as moot.

*11. Exhibit 39*

Michiana objects to Donna Mohlman's Affidavit because it does not contain the affirmation required by 28 U.S.C. § 1746. Because Donna Mohlman's affidavit was sworn to in front of a notary

public, the language of § 1746 for *unsworn* affidavits is not required. *See Pfeil*, 757 F.2d at 859. This objection is overruled.

Michiana objects that the documents attached to and referred to in the affidavit are not certified as required by Rule 56(e). Defendants do not respond to this argument. Accordingly, the objections are sustained, and the Court strikes the exhibits attached to Donna Mohlman's affidavit. Because the Court does not rely on any of the specific objected-to statements in its analysis, the remainder of the motion as to Exhibit 39 is denied as moot.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *See id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e)(2); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that the opposing party's "response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

## FACTUAL BACKGROUND

### A. Dixie Dairy

Dixie Dairy was a milk processing business established in 1899, which operated at a location in Gary, Indiana, from 1922 until it closed its Milk Processing Facility in 1998 when it was sold to Schenkel's All Star Dairy. Schenkel's continued to distribute, but not produce, milk at the facility in Gary under the Dixie Dairy name until it sold the facility to former Dixie Dairy employee Mike Zuilkowski in November 2000. Dixie Dairy began operating a production facility in Union City, Indiana, as part of the Heartland Processors Bankruptcy on May 2, 2001. Dixie Dairy operated the Union City facility until March 1, 2002, when it ceased operations after having made only sporadic payments due under the terms of the operating agreement in the bankruptcy court and having insufficient capital to procure a raw milk supply. An interim operator, Milkco, Inc., took over the Union City facility. Neil Fribley was an agent of the founder of Milkco. Dixie Dairy had several tax liens against it. Dixie Dairy leased machinery from Dupont.[1]

---

[1] Defendants cite page 63 of Zuilkowski's deposition for facts relating to equipment; however, the page 63 submitted to the Court does not contain the facts about the water pouches referenced by Defendants. Although the page has the number 63 at the top right, the page is also identified at the bottom as "Page 60." There is no "Page 63" submitted to the Court.

## B. All Star Beverages Inc.

In February 2002, the principals of American Water Star were Thomas Krucker, Jerry Ludeman, and Christopher Vance.  In the second quarter of 2002, Jerry Ludeman, as CEO of Geyser Water, met Roger Mohlman, and, after extensive meetings, asked that Roger Mohlman move from California to Las Vegas, Nevada, to take a position with Geyser.  After Geyser's name changed to American Water Star, Roger Mohlman's title became President.  In the fall of 2002, American Water Star was introduced to a Canadian company, DuPont, that manufactured flexible packaging. American Water Star, through Ludeman, was looking for partners to co-pack or produce their products for distribution.  Ludeman handled the dealings with Michiana on behalf of All Star Beverage.  Ludeman had contact with Zuilkowski.  In approximately December 2002, All Star Beverages, a Nevada Corporation that had formerly been Star Beverage, Inc., was acquired, by way of Articles of Exchange, by American Water Star.

## C.  Michiana Dairy Processors, LLC

Meanwhile, Thomas McDermott introduced Fribley to Brian Heywood, who then formed Michiana Dairy Processors, LLC, an Indiana limited liability company, on November 15, 2002.  The members were Brian Heywood, Richard Wroblewski, and Neil Fribley.  Fribley became the manager of Michiana.  Neither Fribley or Wroblewski had any experience bottling water.  Heywood was the financier of Michiana.

Michiana took over Dixie Dairy's leases with DuPont (water pouch filler machine) and Echolab (washing equipment) for machinery and brought packaging equipment to the plant.  In 2003, Michiana hired Wendell Neeley, Fribley's brother-in-law, to operate Michiana, and he worked at the plant from January 2003 to August 2003.  When Neeley was hired, Michiana did not have any

customers and had only two machines in an empty plant. Neeley did not have any training in operating a packaging plant. He did have some training in operating the pouch filler machine from a representative from DuPont, and he read the instruction manual that accompanied the pouch filler machine. He fixed the equipment. Wroblewski worked at the Michiana plant for approximately six to seven months. Michiana also hired Zuilkowski to help set up some of the assembly line equipment for the water processing, which was completed at Michiana in approximately April 2003.[2] By April 2003, Zuilkowski became less involved with the plant when he was no longer being paid by Michiana and reverted to his role of landlord. Michiana began hiring five full-time employees, other than Zuilkowski, for the plant in April 2003, who worked there through the end of July when the plant was shut down.

Fribley testified that, at some point, someone from All Star Beverage came to Michiana's facility to observe how Michiana got its machine working because All Star Beverage could not get its machine working in California.

Wroblewski testified that inspectors came to the Michiana facility. He further testified that at all relevant times in 2003, there were no laws required by the Indiana Department of Health for filing a registration or obtaining a permit to operate as a water bottling facility.

Michiana had a water sample that was taken on February 19, 2003, tested by Severn Trent Laboratories, which then issued an "Analytical Report," dated February 26, 2003, to the attention of Rich Wroblewski. Def. Br., Ex. 24. Ludeman, as executive vice president of American Water Star, worked with Wroblewski to run samples of flexible packaging pouches. Michiana operated an Ozonator-ozone machine and a charcoal filter system at the plant. Neeley testified that, once the test

_____

[2] Defendants cite page 51 of Neeley's deposition for additional information about the hiring of Zuilkowski, but page 51 was not submitted to the Court.

run was done, Michiana was in "full production to fulfill orders," and that once they were in full production of water pouches, the plant was operating five days a week. Wroblewski testified that Michiana prepared samples of water pouches for All Star Beverage from February or March through May 2003.[3] Neeley testified that Michiana first started producing product for All Star in late April, early May 2003 and conducted a sample run during that time.

Michiana received orders from All Star Beverage to ship sample water pouches prior to the signing of the Packaging Agreement, and Michiana shipped the sample pouches. Wroblewski testified that Michiana received feedback from All Star Beverage via Roger Mohlman that the "packaging and the quality of the product was very good . . . ." Pl. Br., Exh. 2, p. 55, l. 1-9 (Wroblewski dep.). Wroblewski testified that, for the samples of water, Michiana sent an invoice for shipping only, and a check was sent in the amount of $9598.00 for shipments. However, Wroblewski also agreed that this was a payment "in performance of the contract." *Id*., p. 56, l. 4-5.

Mary Krevosh, who began working for Roger and Donna Mohlman in the spring of 2002 and subsequently worked as an independent contractor for All Star Beverage and/or American Water Star, stated in her deposition that it was her understanding that during the time of this lawsuit, while creditors were trying to seize assets of some of the Defendants, Roger Mohlman was actively hiding corporate assets in warehouses, including water pouch product produced by Michiana.

### D.  The Packaging Agreement and Subsequent Events

Wroblewski negotiated the Packaging Agreement with Roger Mohlman, who was acting on behalf of All Star Beverage. Wroblewski received the faxed Packaging Agreement from Roger

---

[3] Defendants cite page 54 of Wroblewski's deposition for information regarding a sample run; however, "Page 54" submitted as page 5 of 8 pages of Wroblewski's deposition at Exhibit 14 is actually "Page 54" of the deposition of Neeley. Nevertheless, Michiana has offered the deposition testimony regarding the production of sample water pouches.

Mohlman.  Fribley testified that the Packaging Agreement already had Roger Mohlman's signature on it when they received it by fax on June 13, 2003, and that he signed it a few days later.  The Agreement was then faxed back to Roger Mohlman in Las Vegas, Nevada.  Defendants dispute that All Star Beverage ever entered into a written agreement within Michiana.  However, viewing the facts in the light most favorable to Michiana for purposes of summary judgment, as it must, the Court considers the Packaging Agreement as having been properly executed.  The Packaging Agreement required All Star Beverage to purchase a minimum of 900,000 pouches per week, for which All Star Beverage would pay $26,000.00 per week.  Wroblewski testified that, prior to the execution of the Packaging Agreement, the Michiana plant was up and running.  He further testified that after the Packaging Agreement was signed, Michiana produced water pouches for All Star Beverage.  Neeley testified that Michiana ran its sample run on clear non-marked pouch film but ran its production run for American Water Star on pouch film printed for American Water Star.

Fribley testified that, from the time of the Purchase Agreement to the time Michiana determined that All Star Beverage was not performing, Michiana was only producing water. Michiana contracted with NIPSCO for gas and electrical services.[4]  Michiana used 1967.5 therms of gas in January 2003, 7207.3 therms in February 2003, 4,484.9 therms in March 2003, 863.0 therms in April 2003, 3 therms in May 2003, and 65.9 therms from the beginning of May through July 25, 2003.  By late June or early July 2003, Michiana stopped producing water product for All Star Beverage.

---

[4] Defendants also cite page 53 of the deposition of Wendell Neeley for the source of water to the facility, but page 53 has not been submitted to the Court.

Tragically, in August 2003, Heywood was murdered. After Heywood's death, Fribley recovered from Heywood's estate $84,000.00 that he had invested in Michiana through the time of Heywood's death.

In November 2003, DuPont took back the water packaging equipment because All Star Beverage had not paid its bills.

Wroblewski testified that Michiana filed this lawsuit for a number of reasons, one of which was a $9598.35 check issued by Star Beverage, Inc. that was returned for insufficient funds and another of which was for breach of contract. The first indication Michiana had that All Star Beverage was not going to perform was the bounced check. Wroblewski spoke with Roger Mohlman and demanded payment of the bounced check. Roger Mohlman stated that he had "cash flow problems" but that he would "make good" on the check. Pl. Br., Exh. 2, p. 46, l. 3-5 (Wroblewski deposition). Wroblewski made a demand on Roger Mohlman by telephone to deliver further production orders after All Star Beverage stopped sending orders. Wroblewski testified that he never had any written correspondence with Roger Mohlman.

## ANALYSIS

### A. Claim for Intentional Breach of Contract and Claims Against Roger Mohlman

Michiana agrees with Defendants that there is no cause of action for Intentional Breach of Contract under Indiana law. Accordingly, summary judgment is granted in favor of Defendants on Count IV of the Second Amended Complaint. Similarly, Michiana agrees that all claims against Roger Mohlman were discharged in bankruptcy. Accordingly, summary judgment is granted in favor of Defendants on all claims against Roger Mohlman as an individual, including Count I of the Second Amended Complaint for "Individual Liability."

## B.  Breach of Contract

In order for Michiana to recover on its breach of contract claim, it must prove:  (1) that a valid contract existed between it and All Star Beverage; (2) Michiana performed its part of the contract; (3) All Star Beverage failed to perform its part of the contract; and (4) damages.  *Puller Mortgage Assocs., Inc. v. Keegan*, 829 F. Supp. 1507, 1518 (S.D. Ind. 1993) (citing *Strong v. Commercial Carpet Co.*, 322 N.E.2d 387 (Ind. Ct. App. 1975)); *see also  F. McConnell and Sons, Inc. v. Target Data Sys., Inc.*, 84 F. Supp. 2d 961, 977 n. 20 (N.D. Ind. 1999).  Michiana has the burden of proof on these elements at trial.  Defendants seek summary judgment on Michiana's claim for breach of contract, arguing that, because Michiana failed to perform under the contract, Michiana cannot maintain a cause of action for breach of contract against Defendants.

The June 13, 2003 Packaging Agreement provides that All Star Beverage was to provide labeling and packaging equipment to Michiana.  Michiana, in turn, was to label, fill, pack, code, palletize, and stretch wrap water in pouches.  The Packaging Agreement further provides that All Star Beverage "will purchase finished product from" Michiana.  The Packaging Agreement contained the following additional provisions:

> 1.  AUTHORIZATION
> . . . . All manufacturing and packing are to be done in accordance with Quality Assurance Manual (the "Manual") that will be provided.  The Manual is made a part of this Agreement by reference thereto . . .
> . . . .
> 7.  WARRANTY
> In addition to all other warranties expressed or implied by law, MDP warrants that the Product shall meet all of STAR's specifications as outlined in the Manual, be free from defects of workmanship and materials, and be wholesome, merchantable, and fit for the human consumption at the time of delivery to STAR's carrier(s).
> . . . .
> 8.  INSURANCE
> MDP shall, at its expense, arrange and maintain insurance covering comprehensive general commercial liability and casualty Insurance, including blanket contractual

liability, personal injury, and products liability coverage specific to products manufactured by MDP for STAR with limits of not less that[sic] $2,000,000 per occurrence. Such Insurance shall be written on an occurrence-basis policy with an insurance company with a current Best rating of "A" or better.

. . . .

12. TERMS AND CONDITIONS

Unless sooner terminated as hereinafter provided, this Agreement shall be effective from the date  hereof and shall continue for a term of ten (10) years and shall thereafter automatically renew and continue for successive terms of five (5) years unless MDP shall notify the other party, in writing, of its intent not to renew this Agreement at least three (3) months prior to the expiration of the then-current term

. . . .

. . . .

14. ENTIRE AGREEMENT: AMENDMENT

This Agreement and the Exhibits and Schedules attached hereto constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior oral or written agreements and understandings, if any. This Agreement may not be amended or modified except as permitted herein or by a written agreement signed by the parties hereto.

Def. Br., Exh. 23.

Defendants assert, and Michiana does not contest, that the production of bottled or packaged water for human consumption is governed by federal and state law. *See* 21 C.F.R. § 165.110. Purified water is water that has been distilled, deionized, or undergone reverse osmosis. 21 C.F.R. § 165.110(a)(2)(iv). Water obtained from a municipal source must be labeled as such, except when it has been treated to meet the definition of "purified water" in § 165.110(a)(2)(iv). 21 C.F.R. § 165.110(a)(3)(ii). All such water must meet certain requirements concerning substances and contaminants. *See* 21 C.F.R. § 165.110(b)(4). Bottled water must be tested to ensure that water quality meets or exceeds necessary levels. 21 C.F.R. § 165.110(b). The bottled or packaged water must also be from an "approved source," which means a "source of water and the water therefrom . . . that has been inspected and the water sampled, analyzed, and found to be of a safe and sanitary quality according to applicable laws and regulations of State and local government agencies having

19

jurisdiction." 21 C.F.R. § 129.3(a). "The presence in the plant of current certificates or notifications of approval from the government agency or agencies having jurisdiction constitutes approval of the source and the water supply." *Id.*

Federal and state law governs buildings and facilities used for the processing and bottling of bottled drinking water:

> (a) The bottling room shall be separated from other plant operations or storage areas by tight walls, ceilings, and self-closing doors to protect against contamination. Conveyor openings shall not exceed the size required to permit passage of containers.
>
> (b) If processing operations are conducted in other than a sealed system under pressure, adequate protection shall be provided to preclude contamination of the water and the system.
> (c) Adequate ventilation shall be provided to minimize condensation in processing rooms, bottling rooms, and in container washing and sanitizing areas.
> . . .
> (e) Rooms in which product water is handled, processed, or held or in which containers, utensils, or equipment are washed or held shall not open directly into any room used for domestic household purposes.

21 C.F.R. § 129.20. Plants must also provide adequate sanitary facilities, including

> (a) Product water and operations water - -
> (1) Product water. The product water supply for each plant shall be from an approved source properly located, protected, and operated and shall be easily accessible, adequate, and of a safe, sanitary quality which shall be in conformance at all times with the applicable laws and regulations of the government agency or agencies having jurisdiction.
> . . .
> (3) Product water and operations water from approved sources.
> Samples of source water are to be taken and analyzed by the plant as often as necessary, but at a minimum frequency of once each year for chemical contaminants and once every 4 years for radiological contaminants. Additionally, source water obtained from other than a public water system is to be sampled and analyzed for total coliform at least once each week. . . . This sampling is in addition to any performed by government agencies having jurisdiction. . . . Records of approval of the source water by government agencies having jurisdiction [and] records of sampling and analyses for which the plant is responsible . . . are to be maintained on file at the plant.

21 C.F.R. § 129.35.

Additionally, all water-contact surfaces must be sanitized, contact surfaces must be kept in a sanitary condition and inspected, single service containers must be purchased and stored in sanitary closures, and kept clean, and packaging of containers must be done in a sanitary manner. 21 C.F.R. § 129.37. Contact surfaces must be constructed of non-toxic and non-absorbent surfaces. 21 C.F.R. § 129.40. Any processes for the treatment of water (including distillation, reverse osmosis, ion exchanging, ultraviolet treatment), cannot adulterate the bottled product. 21 C.F.R. § 129.80(a). Furthermore, physical inspections must be done of the equipment and records must be maintained concerning the inspections and effectiveness of the equipment. *Id*. Mechanical washers must be inspected and records concerning the inspection results must be kept. *Id.* at § 129.80(b). Cleaning and sanitizing solutions must be sampled and tested with records kept. *Id.* at § 129.80(c). Records of sanitizing operations must be kept. *Id.* at § 129.80(d).

The manufacturer of the bottled/packaged water must also code each unit package with a production code that "shall identify a particular batch or segment of a continuous production run and the day produced. The plant shall record and maintain information as to the kind of product, volume produced, date produced, lot code used, and the distribution of the finished product to wholesale and retail outlets." *Id*. at § 129.80(e). To ensure the packaged water meets minimum health requirements, the plant must, for bacteriological purposes, sample a production run on a weekly basis. *Id*. at § 129.80(g)(1). Chemical, physical, and radiological tests must be done on an annual basis. *Id*. at § 129.80(g)(2). Records must be kept of the sampling results. *Id*. at § 129.80(h).

Similarly, Defendants argue, and Michiana does not disagree, that Indiana state law also governs bottled water. *See* 410 Ind. Admin. Code 7-21-9 (defining "bottled drinking water" under

the Wholesale Food Establishment Sanitation Regulations).  Indiana law prohibits the sale of adulterated food.  Adulterated food consists, in part, of food that has been produced, transported, prepared, packed, or held under unsanitary conditions or in unsanitary containers.  Ind. Code § 16-42-2-2.  The statute requires a "manufacturer, processor, repackager, or wholesale distributor of food . . . to" register with the state department before beginning operations.  Ind. Code § 16-42-1-6; *see also* 410 Ind. Admin. Code 7-21-51.  A person violating Indiana Code § 16-42 commits a Class A or B misdemeanor or a Class D felony.  Ind. Code § 16-42-1-16; Ind. Code § 16-42-1-34.  In addition, a person violating Indiana Code § 16-42 is subject to a civil penalty not to exceed $1000/day.  Ind. Code § 16-42-1-17.

Sanitation requirements for manufacturing operations are found at 410 Indiana Administrative Code 7-21-45.  The physical facilities and grounds

> shall be kept in a condition that will protect against the contamination of food. The methods for adequate maintenance of grounds include, but are not limited to, the following:
> (1) Properly storing or removing unnecessary equipment, removing litter and waste, and cutting weeds or grass within the immediate vicinity of the physical facility that may constitute an attractant, breeding place, or harborage for pests.
> (2) Maintaining roads and parking lots so that they do not constitute a source of contamination in areas where food is exposed.
> (3) Adequately draining areas that may contribute contamination to food by seepage, footborne filth, or providing a breeding place for pests.
> (4) Operating systems for waste treatment and removal of liquid and solid waste at such a frequency that the waste does not constitute a source of contamination in areas where food is exposed.
> . . . .

410 Ind. Admin. Code 7-21-38.

In support of summary judgment on the breach of contract claim, Defendants argue that Michiana failed to perform its part of the contract because it failed to register with the State of Indiana, did not comply with federal regulations, did not comply with requirements concerning its

physical facility, did not routinely inspect its equipment, did not conduct yearly tests for certain contaminants and weekly tests of its production runs for bacteria, and did not obtain the level of insurance required under the Packing Agreement. Noting that Michiana alleges in the Second Amended Complaint that "all product produced by Michiana was of a workman like quality and met the contractual requirements," Sec. Am. Compl., ¶ 15, and that Michiana "has met all of its contractual requirements," *id*. at ¶ 16, Defendants argue that neither statement is true, and that Michiana did not and could not, as a matter of law, provide water that was safe for human consumption. Citing no law on breach of contract or the federal or state requirements for producing bottled water, Michiana responds that the evidence in the record and the reasonable inferences that can be drawn therefrom support the assertions in the Second Amended Complaint.

First, Defendants argue that Michiana failed to perform under the Packaging Agreement because it did not register with the State of Indiana. In support, Defendants identify the testimony of Neil Fribley, one of the members of Michiana Dairy Processors, LLC, who did not recall Michiana having any permits and was not sure if Michiana had any licenses or whether they were required. Defendants also identify the deposition testimony of Richard Wroblewski, the other surviving member of Michiana Dairy Processors, LLC, who testified that, during the time period in question, from November 2002 through the end of 2003, there were no laws in Indiana requiring a permit for bottling water nor were there any laws requiring registration to operate as a water bottling facility. Indiana law requires such registration. Ind. Code § 16-42-1-6; *see also* 410 Ind. Admin. Code 7-21-51. Michiana does not contest the applicability of this law to their operation of bottling water and has offered no evidence to raise a genuine issue of material fact that they were in fact registered.

As for testing the water, Defendants argue that Michiana did not comply with the statutory requirements of testing the bottled product weekly and testing for specific substances and contaminants, as required by federal law, because the one test that was conducted in February 2003 did not test for all the necessary substances. Again, Michiana does not dispute the applicability of the statutory and regulatory requirements for water testing to their operation in the spring of 2003. In response, Michiana offers only the general testimony of Neeley and Wroblewski that water was sent to be tested. In the course of discovery, Defendants asked Michiana to produce all water test results, and Michiana produced only the February 26, 2003 report from Severn Trent Laboratories in Valparaiso, Indiana, for the sample taken on February 19, 2003. The test was conducted three and a half months prior to signing the Packaging Agreement and at least a month if not months prior to the time Michiana began producing sample runs of the water pouches. Michiana does not offer any evidence that it was in fact in compliance with the state and federal requirements for producing bottled water or that proper testing was done, nor has Michiana offered evidence creating a genuine issue as to these matters.

Defendants also contend that Michiana's physical plant did not comply with the strict requirements of state or federal laws, offering photographs depicting the state of the facility after August 2003, just months after the Packaging Agreement was signed and after Michiana stopped producing water product. The photographs show buildings that were falling down, holes in roofs, holes in walls, weeds present, and trash and debris scattered about. Michiana offers no argument that its physical plant was compliant nor has it identified any evidence in the record to raise a genuine issue of material fact that the facility in June 2003 was not in a similar state to that in the

photos or that in June 2003 the facility was in a condition compliant with the statutory and regulatory requirements for the physical facilities and grounds.

Next, Defendants identify Michiana's failure to obtain insurance for not less than $2,000,000.00 per occurrence, offering as evidence the applicable insurance policy that Michiana produced to Defendants in discovery which shows that Michiana had obtained insurance for only $1,000,000.00 per occurrence. Although Michiana argues that Defendants have offered no sworn testimony or affidavits to establish that the requisite insurance coverage was not in place in 2003, because Michiana bears the burden at trial of proving it was performing under the contract, Michiana has the burden on summary judgment of offering admissible evidence to raise a genuine issue of material fact that Michiana did have the insurance coverage required by the Packaging Agreement. Michiana has not attempted to meet this burden.

Rather, in an effort to raise a genuine issue of material fact on the breach of contract claim, Michiana argues that the payment of a $9598.00 check by All Star Beverage leads to the reasonable inference that All Star Beverage would not have paid for any of Michiana's water product if that product was not contractually compliant. However, the deposition testimony of Wroblewski, viewed in the light most favorable to Michiana, is that the $9598.00 payment was for the shipping costs of the water, not the water itself. Moreover, the check, made out to Michiana Dairy Processors from Star Beverage, Inc., is dated June 11, 2003, which is prior to the execution of the Packaging Agreement.

Without citing law, Michiana also argues ratification as a basis for denying summary judgment on contractual compliance, reasoning that the trier of fact should decide whether there was ratification of the contract through Roger Mohlman's conduct of secretly hiding and storing

Michiana's product. "Ratification applies when a party to a contract, with knowledge of facts entitling that party to rescind the contract, treats the contract as a continuing and valid obligation, thus leading the other party to believe that the contract is still in effect." *Smith v. McLeod Distributing, Inc.*, 744 N.E.2d 459, 465-66 (Ind. Ct. App. 2000) (quoting *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1236 n. 6 (Ind. 1994)). The evidence of record is that the sample water pouches produced by Michiana and sent out at the request of All Star Beverage were sent out prior to the signing of the Packaging Agreement in June 2003. There is no evidence that Michiana produced bottled water under the Packaging Agreement that was then kept by Roger Mohlman or any of the Defendants.

Based on the foregoing, Michiana has failed to meet its burden of producing admissible evidence to raise a genuine issue of material fact that Michiana was performing under the Packaging Agreement, and summary judgment in favor of Defendants is granted on Michiana's breach of contract claim in Count III of the Second Amended Complaint.

### C. Fraudulent Inducement

Fraudulent inducement occurs when a party, through fraudulent misrepresentations, induces another to enter into a contract. *Lighting Litho, Inc. v. Danka Indus., Inc.*, 776 N.E.2d 1238, 1241 (Ind. Ct. App. 2002), *trans. denied*. The elements of fraud in the inducement are "(1) a material misrepresentation of past or existing fact which (2) was false, (3) was made with knowledge or reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) proximately caused injury to the complaining party." *Tru-Cal, Inc. v. Conrad Kacsik Instrument Sys., Inc.*, 905 N.E.2d 40, 44-45 (Ind. Ct. App. 2009) (quoting *Bilimoia Computer Sys., LLC v. Am. Online, Inc.,* 829 N.E.2d 150, 155 (Ind. Ct. App. 2005)).

However, a claim of fraudulent inducement may be barred by a contract's integration clause if based on oral misrepresentations made prior to the execution of the contract. *See Tru-Cal*, 905 N.E.2d at 44 (citing *Circle Ctr. Dev. Co. v. Y/G Ind., LP.*, 762 N.E.2d 176, 180 (Ind. Ct. App. 2002)). A party may overcome the effect of such an integration clause if the party can show that it had a right to rely on the alleged misrepresentations and did in fact rely on them in executing the integration clause. *Id.* at 45 (citing *Circle Ctr.*, 762 N.E.2d 176; *Prall v. Indiana Nat'l Bank*, 627 N.E.2d 1374 (Ind. Ct. App. 1994)).

Michiana admittedly has not identified any false representations made by any Defendant prior to the execution of the Packaging Agreement that then induced Michiana to enter into the Packaging Agreement. Even if Michiana had, the contract in this case contains the following integration clause, which bars any claim of fraudulent inducement based on prior oral misrepresentations:

> This Agreement and the Exhibits and Schedules attached hereto constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior oral or written agreements and understandings, if any. This Agreement may not be amended or modified except as permitted herein or by a written Agreement signed by the parties hereto.

Def. Br., Exh. 23. Michiana does not dispute the effect of the integration clause.

Rather, Michiana asserts that the basis of its fraudulent inducement claim is the written representations in the contract and Roger Mohlman's specific oral request to produce additional product–a request made *after* the contract was executed–that induced Michiana to continue to produce product on behalf of All Star Beverage into late June/early July *after* the contract was executed. Without citing any law, Michiana argues that none of the cases cited by Defendants deal with "post-contract fraudulent inducement." However, as cited above, a cause of action for

fraudulent inducement occurs when a party is induced to inter into a contract. Michiana has not

identified any additional contract in which it was induced to enter, arguing only that it was induced

to produce additional product. Therefore, summary judgment is granted in favor of Defendants on

Michiana's claim of fraudulent inducement in Count V of the Second Amended Complaint.

### D. Piercing the Corporate Veil and Setting Aside Fraudulent Transfers

Both the claim for piercing the corporate veil and the claim for setting aside fraudulent

transfers require that the corporate Defendants be liable to Michiana or be debtors. A party seeking

to pierce the corporate veil bears the burden of establishing "that the corporation was so ignored,

controlled or manipulated that it was merely the instrumentality of another, and that the misuse of

the corporate form would constitute a fraud or promote injustice." *Franklin Elec. Co., Inc. v.

Unemployment Ins. Appeals of Dept. of Workforce Dev.*, 928 N.E.2d 880, 884 (Ind. Ct. App. 2010)

(quoting *Gurnik v. Lee*, 587 N.E.2d 706, 710 (Ind. Ct. App. 1992)). However, piercing the corporate

veil is not a separate cause of action but rather a means of imposing liability for an underlying cause

of action, such as breach of contract. *See RSR Corp. v. Avanti Dev. Inc.*, No. IP 95-1359-C-M/S,

2000 WL 1448705, at *11 (S.D. Ind. Mar. 31, 2000) (citing Fletcher Cyc. Corp., § 41.28). As for

fraudulent transfers, to prevail upon an action to set aside a fraudulent transfer, which is governed

by Indiana Code § 21-32-18-2, a plaintiff must prove that the debtor made the transfer with actual

intent to defraud the creditor or without receiving a reasonably equivalent value in exchange for the

transfer. *Rice v. Comm'r, Ind. Dept. of Envtl. Mgmt.*, 782 N.E.2d 1000, 1004 (Ind. Ct. App. 2003)

(citing Ind. Code § 21-32-18-2).

Michiana argues that the overwhelming evidence of Roger and Donna Mohlman's misdeeds

in taking corporate assets for their own private purposes precludes summary judgment. However,

the Court has granted summary judgment in favor of Defendants on Michiana's underlying substantive claims of breach of contract and fraudulent inducement. Therefore, Defendants are not liable for fraud or breach of contract nor are they debtors, and, for purposes of this cause of action, whether the Mohlmans manipulated the corporate entities as alleged by Michiana is immaterial. Summary judgment on the claims of piercing the corporate veil and setting aside fraudulent transfers in Count II of the Second Amended Complaint is granted. Finding that Michiana is not entitled to equitable relief, the Court need not address Defendants' argument that Michiana did not have clean hands.

## F. Claims of Constructive Fraud and Fraudulent Concealment Against Donna Mohlman

In the Second Amended Complaint, Michiana alleges that Donna Mohlman used company assets for her own personal use, used trusts to siphon monies from the corporations, falsified corporate records, and entered into sham transactions. Michiana further alleges that Donna Mohlman engaged in material misrepresentations and made false and misleading statements of material fact to Michiana.

"Actual fraud consists of five elements: 1) [Donna Mohlman] must have made at least one representation of past or existing fact; 2) which was false; 3) which [she] knew to be false or made with reckless disregard as to its truth or falsity; 4) upon which [Michiana] reasonably relied; 5) and which harmed [Michiana]." *Heyser v. Noble Roman's Inc.*, 933 N.E.2d 16, 19 (Ind. Ct. App. 2010) (citing *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 319 (Ind. Ct. App. 1991)). To make out a claim of constructive fraud, Michiana must prove "1) a duty owing by [Donna Mohlman] to [Michiana] due to their relationship; 2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; 3) reliance thereon by

[Michiana]; 4) injury to [Michiana] as a proximate result thereof; and 5) the gaining of an advantage by [Donna Mohlman] at the expense of [Michiana]." *Heyser*, 933 N.E.2d at 19 -20 (citing *Siegel v. Williams*, 818 N.E.2d 510, 515-16 (Ind. Ct. App. 2004)).

Defendants assert that Donna Mohlman never had communications, oral or otherwise, with anyone at Michiana. Defendants offer the testimony of Fribley that, during the relevant time period, he had never met Donna Mohlman, that he did not believe he had ever spoken with her, and that he had never seen any written communications from her. Defendants also offer the testimony of Wroblewski that, during the relevant time period, he had never met Donna Mohlman and that he had not spoken with her. Michiana has not offered evidence that Donna Mohlman ever had any communications with anyone at Michiana, much less deceptive material misrepresentations.

The only evidence Michiana offers of a "material misrepresentation" by Donna Mohlman is the statement within the Packaging Agreement: "Star hereby authorizes [Michiana] to manufacture and package Star's Beverages (the "Product"), and [Michiana] accepts such work." Pl. Br., Exh. 7, App'x A. Michiana reasons that Donna Mohlman actively participated in the fraud of taking Michiana's product by using her husband, Roger Mohlman, as the "front man," citing testimony of Mary Krevosh that Donna Mohlman was a leader in the company for product development, oversaw everyone in the company, schemed with Roger Mohlman to take corporate assets, and actively hid assets from creditors. Pl. Br., p. 30. However, Donna Mohlman was not a signatory to the Packaging Agreement, and Michiana has not offered any evidence to raise a genuine issue of material fact that Donna Mohlman was in any way involved with the Packaging Agreement at issue in this case.

Defendants also argue that Donna Mohlman did not owe any duty to Michiana, which is an element of constructive fraud. "The existence of a duty for constructive fraud may arise in one of two ways: by virtue of the existence of a fiduciary relationship, or, in the case where there is a buyer and a seller, where one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other." *Am. Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 247 (Ind. Ct. App. 2010) (citing *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996)). In response, Michiana offers no evidence of a fiduciary relationship between Donna Mohlman and Michiana. Accordingly the claims sounding in fraud against Donna Mohlman fail and summary judgment is granted in her favor.

Finally, in its response brief, Michiana suggests that the corporate Defendants did not seek summary judgment on the claims of fraud and constructive fraud against them, and, thus the claims survive. However, there are no allegations in the Second Amended Complaint for fraud or constructive fraud against the corporate Defendants; Michiana only alleges a claim of fraudulent inducement against the corporate defendants, which the Court previously addressed. Thus, there are no claims of fraud against the corporate Defendants.

### G. Claim for Money Had and Received Against Donna Mohlman

In a common law action for money had and received, a plaintiff must "prove only his right to the money and the defendant's possession, . . . ; and any facts, circumstances, or dealings from which it appears that the defendant has in his hands money of the plaintiff which he ought in justice and conscience to pay over to him . . . ." *Watson v. Sears*, 766 N.E.2d 784, 790 (Ind. Ct. App. 2002) (citing *Pufahl v. Nat'l Bank of Logansport*, 154 N.E.2d 119, 120-21 (1958)). Defendants argue that Michiana never loaned Donna Mohlman any money. Michiana does not address this claim in its

response brief. Accordingly, summary judgment on the claim for money had and received is granted in favor of Donna Mohlman.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS in part and DENIES in part** the Motion to Strike [DE 184] and **GRANTS** the Motion for Summary Judgment [DE 171].

As summary judgment was not sought on the any of the Counterclaims in this case, the Counterclaims of Donna Mohlman [DE 6], the American Water Star Corporate Defendants [DE 21], and All Star Beverage, Inc. [DE 22] **REMAIN PENDING**.

The Court **REAFFIRMS** the October 15, 2010 final pretrial conference and the November 6, 2010 bench trial setting on the <u>Counterclaims only</u>.

SO ORDERED this 12th day of October, 2010.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc: All counsel of record